ALL STAR ENTERPRISE, INC. a/k/a Bernard Well Service, Antero Resources Corporation, Antero Resources Piceance Corporation, and Frontier Drilling, L.L.C., Appellants

v.

Erin BUCHANAN, Individually, as Representative of the Estate of Joseph Buchanan, Jr., and as Next Friend of Christopher D. Buchanan and Taylor N. Buchanan, Minors, Appellees.

No. 14–08–01064–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Oct. 8, 2009.

Mark Andrew Youngjohn, Houston, TX, Brett M. Godfrey, Englewood, CO, Christopher M. Volf, Randy Fairless, Sugar Land, TX, for Appellants.

Erin Kenna Copeland, Kenneth T. Fibich, Houston, TX, for Appellees.

Panel consists of Justices ANDERSON, GUZMAN, and BOYCE.

## OPINION

EVA M. GUZMAN, Justice.

In this wrongful-death and survival action, four nonresident defendants appeal the denial of their respective special appearances. Because the Texas contacts of All Star Enterprise, Inc., Antero Resources Piceance Corp., and Frontier Drilling, L.L.C. are insufficient to establish general or specific jurisdiction, we reverse the trial court's rulings as to them and remand the claims against them for severance and dismissal. The Texas contacts of Antero Resources Corporation, however, are sufficient to support general jurisdiction, and the exercise of such jurisdiction does not offend traditional notions of fair play and substantial justice; thus, we affirm the trial court's denial of its special appearance.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On July 19, 2007, Joseph "Jay" Buchanan, Jr. was killed by a piece of falling equipment while working at a drilling rig known as Rig No. 3 in the Piceance Basin of Garfield County, Colorado. At the time of his death, Jay, his wife, and his minor children were citizens of Louisiana temporarily residing in Colorado, but by the time his wife, individually and on behalf of the children and her late husband's estate (collectively, "Buchanan"), filed this wrongful-death action in Harris County, Jay's survivors again resided in Louisiana. On August 30, 2007, Buchanan sued (a) Halliburton Company, (b) All Star Enterprise, Inc. d/b/a Bernard Well Service ("All Star"), and (c) Antero Resources Corporation ("Antero"). On October 12, 2007, Buchanan added Frontier Drilling, L.L.C. ("Frontier") as a defendant, and on March 7, 2008, Antero Resources Piceance Corpora-

tion ("Piceance") was added to the suit. All Star, Antero, Piceance, and Frontier each filed a special appearance, and each was denied by the trial court. In this interlocutory appeal, each presents a single issue challenging the trial court's denial of its special appearance.

## II. STANDARD OF REVIEW

■ The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the long-arm statute. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex.2002). The nonresident defendant then bears the burden of proof to negate all bases of personal jurisdiction asserted by the plaintiff. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex.2007).

■ The determination of whether the trial court has personal jurisdiction is a question of law. *BMC Software*, 83 S.W.3d at 794. If a trial court must resolve disputed questions of fact before resolving the jurisdictional issue but renders no findings of fact, the trial court's implied factual findings may be challenged for legal and factual sufficiency where, as here, the appellate record includes both the reporter's record and the clerk's record. *Id.* at 794–95. On appeal, we consider all of the jurisdictional evidence before the trial court. *Fish v. Tandy Corp.*, 948 S.W.2d 886, 891 (Tex.App.-Fort Worth 1997, pet. denied). If the special appearance is based upon undisputed or established facts, the appellate court conducts a de novo review of the trial court's order. *Conner v. ContiCarriers & Terminals, Inc.*, 944 S.W.2d 405, 411 (Tex.App.-Houston [14th Dist.] 1997, no writ).

## III. GOVERNING LAW

■ It is well-established that our state courts may properly exercise person-

al jurisdiction over a nonresident corporate defendant only if federal due process requirements and the requirements of the Texas long-arm statute are satisfied. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 412–13, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Because the personal jurisdiction of Texas courts extends " 'as far as the federal constitutional requirements of due process will permit,' " we rely on precedent from both federal and state courts in determining whether a nonresident defendant has met its burden to negate all bases of jurisdiction. *BMC Software,* 83 S.W.3d at 795 (quoting *U-Anchor Adver., Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex.1977)). State statutory and federal due-process requirements are satisfied if (a) the nonresident corporation has certain minimum contacts with Texas, and (b) our exercise of personal jurisdiction over the nonresident does not offend "traditional notions of fair play and substantial justice." *See Helicopteros,* 466 U.S. at 412–13, 104 S.Ct. 1868; *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

## A. Minimum Contacts

The first of these requirements, that of sufficient minimum contacts, is satisfied if the nonresident defendant has " 'purposefully avail[ed] itself of the privileges of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). The "purposeful availment" requirement ensures that a nonresident corporation will not be haled into a foreign jurisdiction based on " '[t]he unilateral activity of those who claim some relationship' " with the defendant or as the result of " 'random,' 'fortuitous,' or 'attenuated' contacts." *Id.*

(quoting *Hanson,* 357 U.S. at 253, 78 S.Ct. 1228); *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).

To determine whether the nonresident corporate defendants have purposefully availed themselves of the privileges of conducting business within the State of Texas, three factors are relevant here. *See Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 785 (Tex. 2005). First, we consider only each defendant's own actions. *Id.* Second, the acts of each defendant must be "purposeful," rather than random, isolated, or fortuitous. *Id.* Third, each "defendant must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction." *Id.* (citing *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). Because "all contacts [must] be carefully investigated, compiled, sorted, and analyzed for proof of a pattern of continuing and systematic activity," we do not consider any of a defendant's contacts in isolation, but instead apply these factors to all of each nonresident defendant's contacts with Texas. *Schlobohm v. Schapiro,* 784 S.W.2d 355, 359 (Tex.1990). "[I]t is not the number, but rather the quality and nature of the nonresident defendant's contacts with the forum state that [are] important." *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 230 n. 11 (Tex.1991).

## B. Fair Play and Substantial Justice

The plaintiff bears the initial burden to show that assertion of personal jurisdiction fulfills the second due-process requirement, i.e., that it comports with traditional notions of fair play and substantial justice. *In re S.A.V.,* 837 S.W.2d 80, 85 (Tex.1992). But as we have previ-

ously noted, "[s]ometimes the exercise of jurisdiction may not be reasonable *even if* the nonresident defendant has purposely established minimum contacts with the forum state." *Conner,* 944 S.W.2d at 411 (citing *Guardian Royal Exch.,* 815 S.W.2d at 228). If the defendant has established such minimum contacts, then it is the defendant who bears the burden to present a compelling argument establishing that the exercise of jurisdiction would be unreasonable. *Id.* (citing *Guardian Royal Exch.,* 815 S.W.2d at 231). In making this determination, courts may consider factors such as the burden on the defendant, the interests of the forum state in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the states in furthering fundamental substantive social policies. *Burger King Corp.,* 471 U.S. at 476–77, 105 S.Ct. 2174; *Guardian Royal Exch.,* 815 S.W.2d at 231. Such factors may establish the reasonableness of the exercise of personal jurisdiction upon a lesser showing of minimum contacts than otherwise would be required, but rarely will support a finding that the exercise of jurisdiction is contrary to the principles of fair play and substantial justice. *Project Eng'g USA Corp. v. Gator Hawk,* 833 S.W.2d 716, 722–23 (Tex.App.-Houston [1st Dist.] 1992, no writ). Most fairness considerations instead may be accommodated without finding the exercise of personal jurisdiction unconstitutional. *Guardian Royal Exch.,* 815 S.W.2d at 231 (citing *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174).

**C. Specific Jurisdiction**

▮▮▮▮ There are two types of personal jurisdiction: specific and general. Specific jurisdiction is dispute-specific, and it attaches when the plaintiff's cause of action arises out of or relates to the nonresident defendant's contacts with the forum state. *Conner,* 944 S.W.2d at 410. To invoke a state's specific jurisdiction, the defendant's activities must have been "purposefully directed" to the forum, *id.,* and there must be a substantial connection between the defendant's forum contacts and the operative facts of the litigation. *Moki Mac,* 221 S.W.3d at 585.

In her live pleadings, Buchanan contends the trial court has jurisdiction over appellants because "they do business in Texas, maintain continuing, systematic contacts with Texas, maintain agents for service of process in Texas and/or are amenable to service in Texas." Thus, Buchanan has asserted the existence of facts which, if true, would support the trial court's exercise of general jurisdiction. Although Buchanan did not plead facts that purport to substantially connect any appellant's contacts with Texas to the operative facts of this litigation, the existence of specific jurisdiction appears to have been tried by consent of the parties. *See* TEX.R. CIV. P. 67; *see also Olympia Capital Assocs., L.P. v. Jackson,* 247 S.W.3d 399, 412 (Tex.App.-Dallas 2008, no pet.) (concluding that an unpleaded basis for jurisdiction was tried by consent when addressed by the parties in a motion for reconsideration and the response to the motion).

**D. General Jurisdiction**

▮▮▮▮ Because general jurisdiction is "dispute blind" and requires contacts of a "continuous and systematic" nature, it is more difficult to establish than specific jurisdiction. *See Helicopteros,* 466 U.S. at 414–16, 104 S.Ct. 1868; *Int'l Shoe,* 326 U.S. at 320, 66 S.Ct. 154. To determine whether a nonresident defendant has continuous and systematic contacts with Texas sufficient to support general jurisdiction,

we examine the defendant's contacts and forum-related activities up to the time that suit was filed. *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 170 (Tex.2007). Buchanan sued All Star and Antero on August 30, 2007, Frontier on October 12, 2007, and Piceance on March 7, 2008; thus, for the purposes of establishing general jurisdiction, only contacts before the date applicable to that defendant are relevant.

## IV. ALL STAR

In support of its special appearance, All Star produced the affidavit of its owner, Terry Huckins, who attested to the following:

- All Star is a Colorado corporation with its principal place of business in Garfield County, Colorado.
- It has no offices, shareholders, bank accounts, leases, real property, vehicles, chattel, business personal equipment, loans, notes, promissory notes, or other stock in Texas.
- No Texas resident has any ownership interest in All Star.
- All Star has no Texas address or phone number.
- All Star has never performed any services in Texas or entered into any contracts in Texas for services to be performed elsewhere.
- It does not advertise in Texas, recruit employees in Texas, or maintain a website.

- All Star does not have, and is not required to have, a registered agent in Texas.
- All Star was not served with process in Texas, and has never previously been sued in Texas.

Buchanan offered no evidence controverting these facts. Instead, she contends that All Star's minimum contacts with Texas are to be found in its contracts with third parties, its relationship to others who have a Texas address, its previous operation of a mail-order business, and its purchases from Texas vendors.

### A. Master Service Agreement with Oxy USA WTP LP

 As one of the points establishing All Star's minimum contacts, Buchanan relies on a Master Service Agreement between All Star and Oxy USA WTP LP ("Oxy") executed just twenty-eight days before Jay's death. In this contract, All Star and Oxy agreed that Oxy "may from time to time request that [All Star] perform services and/or provide materials to [Oxy]" and that such requests, referred to as "commercial terms," would establish the scope of All Star's work and compensation. The contract does not require work to be performed in Texas.[1]

 Buchanan emphasizes that Oxy and All Star agreed that Texas law would apply to the contract "except where otherwise provided in the commercial terms."[2]

---

1. Buchanan argues that the Oxy contract was for work to be performed at the Piceance Basin, but the contract was produced in response to a Request for Production from April 2008 that sought "[a]ll written contracts related to work [All Star] has performed at the Piceance Basin in Rifle, Colorado from 2002 *to the present*." (emphasis added). Buchanan does not identify how the contract is related to the facts of this case, and there is no evidence that All Star performed work pursu-

ant to the contract before Buchanan filed suit against it on August 30, 2007. *See PHC–Minden*, 235 S.W.3d at 170.

2. Although choice-of-law provisions may be considered in the jurisdictional analysis, we note that individuals are free to "structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct.

Although choice-of-law provisions are properly considered in minimum-contacts analysis, substantially more is required to meet the threshold requirements for general jurisdiction. *See Burger King*, 471 U.S. at 482, 105 S.Ct. 2174 (explaining that Florida choice-of-law provision combined with twenty-year relationship with company's Miami headquarters "reinforced [franchise owner's] deliberate affiliation with the forum State"). Buchanan also relies on a contract provision in which All Star and Oxy agreed to "voluntarily submit to the jurisdiction of the courts of Harris County, Texas for the adjudication of their liabilities and responsibilities under this agreement." But if the mere existence of an agreed forum-selection clause in a particular contract were sufficient to establish general jurisdiction, then courts of the forum state generally would not need to determine if a dispute against a nonresident party to the agreement fell within the scope of the forum-selection clause, because the clause's mere existence would result in general jurisdiction. We know, however, that this is not the case. *See, e.g., Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Prod., Inc.*, 234 S.W.3d 679, 687 (Tex.App.-Houston [14th Dist.] 2007, pet. denied) (explaining that when determining whether to enforce a mandatory forum-selection clause, courts first must determine whether the asserted claims fall within the clause's scope). The forum-selection clause at issue here may be better understood as an agreement that the litigation of certain identified disputes will be instituted in Texas and the parties to the clause will waive objection to the exercise of specific jurisdiction in those cases. Nevertheless, the failure to challenge personal jurisdiction in a case in which a Texas court apparently would be able to exercise specific jurisdiction does not demonstrate that a nonresident defendant has the continuous and systematic contacts with Texas necessary for the exercise of general jurisdiction. *Johns Hopkins Univ. v. Nath*, 238 S.W.3d 492, 501 (Tex.App.-Houston [14th Dist.] 2007, pet. denied). Here, moreover, the forum-selection clause was not utilized; Oxy and All Star did not engage in Texas litigation to determine their respective rights and obligations under their agreement.

In urging us to accord greater significance to such choice-of-law and choice-of-forum provisions, Buchanan relies on *Project Engineering USA Corp. v. Gator Hawk, Inc.*, 833 S.W.2d at 722. There, the First Court of Appeals found sufficient contacts to sustain the trial court's exercise of general jurisdiction over a nonresident corporation based primarily on evidence that the corporation had been a representative or distributor for three different Texas companies for years, and these relationships required frequent contact between the companies and the defendant. *Id.* One of the distributorship agreements not only specified the application of Texas law in a Texas venue, but also was executed in Houston and had been in place for ten years. *Id.* at 720. At least one sale was made pursuant to the contract. *Id.* An oral representation agreement with another Texas company had been in effect for six years. *Id.* at 720–21.

■ Analogizing All Star's contract with Oxy to the contacts described in *Gator Hawk*, Buchanan argues it was fore-

---

559. In addition, application of another state's laws can be used to bring predictability to the contract while circumventing jurisdictional problems. *See Burger King*, 471 U.S. at 476–77, 105 S.Ct. 2174 (discussing the application of the forum state's choice-of-law rules to apply the "fundamental substantive social policies of another State" (citing *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 307–13, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981) (plurality op.))).

seeable that All Star would be haled into a Texas court. But "[f]oreseeability alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *HMS Aviation v. Layale Enters., S.A.*, 149 S.W.3d 182, 195 (Tex.App.-Fort Worth 2004, no pet.) (citing *World–Wide Volkswagen*, 444 U.S. at 295, 100 S.Ct. 559). Although All Star reasonably should have anticipated that it could be called into a Texas court to respond to a lawsuit involving its contract with Oxy, that contract is totally unrelated to Buchanan's claims. Moreover, the longstanding distributorship agreements discussed in *Gator Hawk* created substantially stronger ties than those instituted by All Star's contract with Oxy. Unlike the *Gator Hawk* agreements, the Oxy contract itself neither required nor permitted All Star to perform any work for or render any service to Oxy unless Oxy submitted an additional request, governed by its own commercial terms, that was independently accepted by All Star. There is no evidence that either of these events occurred.

## B. PXP Master Service Agreement

Buchanan also relies on a Master Service Agreement between All Star and Plains Exploration & Production Company and its subsidiaries (collectively, "PXP"). We note at the outset that there is no connection between the operative facts of this litigation and the PXP contract, which was executed after Jay's death. *Cf. Nogle & Black Aviation, Inc. v. Faveretto*, 290 S.W.3d 277, 283–85 (Tex.App.-Houston [14th Dist.] 2009, no pet. h.) (holding that a nonresident defendant's contract with a Texas-based individual to design an inspection procedure for a wing spar supported specific jurisdiction where plaintiffs asserted negligence in the design and inspection of the wing spar). Buchanan does not contend that All Star solicited the contract;

rather, it is undisputed that All Star's relationship with PXP began after PXP purchased one of All Star's existing Colorado clients. The record does not show that All Star performed any services under the contract in the six weeks between its execution and the date suit was filed.

Buchanan nevertheless argues that the contract obligated All Star to perform work in Texas, "maintain contacts pertaining to the contract through Texas," and be bound by Texas law. She further asserts that All Star contractually agreed to submit to Texas jurisdiction and venue. Buchanan cites no specific provision for any of these contentions nor have we found any that support her argument. To the contrary, the contract contains no provisions concerning jurisdiction, forum, or venue, and does not require All Star to perform work in Texas. Moreover, the choice-of-law provision provides that "this Contract shall be governed, construed, and enforced in accordance with the General Maritime Law"; under the terms of the contract, Texas law applies to the contract's construction only if general maritime law does not. Because Buchanan's arguments concerning the substantive terms of this contract are unsupported by the record, they are unpersuasive.

## C. Texas Addresses of Other Entities

Buchanan additionally relies on various documents that list a Texas address for a person or business with some connection to All Star. For example, under the terms of their contract, All Star is required to send notices, bills, or other communications to PXP's Houston address. Buchanan further points out that PXP operates from Texas, and that it is the holder of a certificate of liability insurance in which PXP's address is stated to be in Texas and in which All Star is named as an additional insured. She also cites a provision in All

Star's contract with Oxy concerning the manner in which invoices may be submitted: although Oxy maintains a physical and mailing address in Colorado and has expressed its preference that All Star submit invoices digitally, the terms of the contract also permit All Star to mail invoices to Oxy at a Texas post-office box.[3]

Although Buchanan argues that these writings support a finding that All Star has the requisite minimum contacts with Texas, we may consider only the defendant's own actions. *See Michiana Easy Livin' Country*, 168 S.W.3d at 785. This evidence cannot support a finding of jurisdiction because it demonstrates only the unilateral choices of third parties who have some connection to All Star, rather than contacts and conduct by All Star.. *See Burger King*, 471 U.S. at 475, 105 S.Ct. 2174 (explaining that jurisdiction cannot be based on the unilateral activity of a third party); *U–Anchor Adver., Inc.*, 553 S.W.2d at 763 (explaining that a nonresident who agrees to and actually remits payment to a Texas address identified in a contract "has engaged in no 'activity' in Texas"); *see also Nath*, 238 S.W.3d at 501 ("[E]mployment of ten employees who reside in Texas does not show purposeful availment because their residency is based on their own choice or the requirement of a third party.").[4]

### D. All Star's Former Mail–Order Business

 Buchanan bases another argument on a single sentence drawn from Huckins's deposition: "Under All–Star's umbrella, a while back I owned a wheel-and-tire shop, and it was a mail-order wheel-and-tire shop, so we would mail out basically all over the country, you know, but it was all out of a warehouse here in Denver." All Star sold this enterprise in February 2006.

Buchanan reasons that because Huckins testified that All Star mailed its products "basically all over the country" and Texas is a part of this country, All Star established minimum contacts with Texas. We disagree. There is no evidence that All Star mailed any products to Texas, advertised or solicited orders in Texas, conducted business in Texas, or otherwise directed its activities here.

### E. Purchases from Texas Vendors

Lastly, Buchanan points out that All Star made regular purchases from Texas vendors who then shipped the purchased material to All Star in Colorado, and on two occasions, All Star sent an employee to Texas to take possession of a truck purchased from a Texas vendor or broker. But as previously discussed, it is well-established that, without more, purchases and related trips are not a sufficient basis for general jurisdiction. *Helicopteros*, 466 U.S. at 417, 104 S.Ct. 1868 (citing *Rosenberg Bros. & Co. v. Curtis Brown Co.*, 260 U.S. 516, 518, 43 S.Ct. 170, 67 L.Ed. 372 (1923)); *PHC–Minden*, 235 S.W.3d at 170 (same). Although one of these trucks was used at the same site where Jay was killed, Buchanan does not allege that it— or any other equipment purchased from a Texas vendor—played a role in the accident or in Jay's death.

---

**3.** For the sake of completeness, we note that Buchanan cites no evidence that All Star actually mailed invoices to Oxy's Texas address.

**4.** Buchanan also refers us to evidence that an All Star employee residing in Colorado wrote a Texas address on his W–4 form, but the only identified date of this person's employment was December 2007, after suit was filed. *But see PHC–Minden*, 235 S.W.3d at 170 (holding that courts are to consider the nonresident defendant's presuit contacts).

In sum, our review of the record has revealed no allegations or evidence of a substantial connection between the operative facts of this litigation and any of All Star's Texas contacts. Hence, we conclude that the trial court's ruling denying All Star's special appearance cannot be affirmed based on specific jurisdiction. Moreover, the jurisdictional evidence, taken together, is insufficient to support the conclusion that All Star had continuous and systematic contacts with Texas such that it became subject to the exercise of general jurisdiction.

## F. Fair Play and Substantial Justice

■ Consideration of the factors relevant to the fairness analysis does not support a conclusion that the exercise of personal jurisdiction over All Star accords with traditional principles of fair play and substantial justice. All Star's Texas contacts fall far short of the minimum required, and Texas has no interest in adjudicating the claims of one nonresident against another regarding a tort that allegedly occurred and caused damage elsewhere and that does not concern Texas law, Texas property, other Texas litigation, or some similar connection to this state. The interests of convenience, efficiency, and coequal sovereignty are all better served by litigation in Colorado. *See Guardian Royal Exch.*, 815 S.W.2d at 231; *see also Brittingham–Sada de Powers v.*

*Ancillary Estate of Brittingham–McLean,* 158 S.W.3d 518, 525 (Tex.App.-San Antonio 2004, pet. denied) (noting in its fairness evaluation that there was no evidence that the foreign court most closely connected to the parties and relevant facts lacked jurisdiction to resolve the claims presented).

The only argument presented concerning the last "fairness factor"—i.e., that of the states' shared interest in furthering fundamental substantive social policies—is Buchanan's assertion that allowing litigation to proceed in Texas is "more fair than requiring [her] to litigate against hometown companies in their own community, which would further social policies of fairness in the judicial system for all litigants, not just the Colorado locals."[5] Because this unsupported argument is inimical to the presumption that judges and prospective jurors are impartial,[6] we categorically reject it.[7]

We conclude that the record does not support the trial court's exercise of personal jurisdiction over All Star. We therefore reverse the trial court's order denying All Star's special appearance and remand those claims with instructions to the trial court to sever and dismiss them.

## V. ANTERO

On appeal, Antero first argues that it "satisfied its burden to negate all bases of personal jurisdiction by presenting evidence demonstrating that it was a nonresi-

---

**5.** Buchanan does not contend, however, that litigation in Harris County, Texas, where defendant Halliburton maintains its principal place of business, subjects her to similar unfairness from litigating "against hometown companies in their own community."

**6.** *See Murphy v. Florida,* 421 U.S. 794, 800–01, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) (discussing presumption that prospective jurors are impartial); *Fowler v. Buckner,* 23 Tex. 84, 1859 WL 6250, at *3 (1859) (explaining that judges are presumed to be impartial).

**7.** *See M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 12, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); *see also In re AIU Ins. Co.,* 148 S.W.3d 109, 114 (Tex.2004) (rejecting as "highly offensive to a system of justice based on the rule of law" the suggestion that a tribunal should consider the benefits to the local community in presiding over a case regarding insurance proceeds that would "benefit Texans or Texas businesses").

dent." Although this might be sufficient if Buchanan pleaded no jurisdictional facts,[8] Buchanan did plead that the defendants conduct business here and maintain continuing, systematic contacts with Texas. The record further suggests that in addition to general jurisdiction, specific jurisdiction was tried by consent. We therefore consider whether the record supports a finding of jurisdiction on either basis. But because two "Antero Resources Corporations" are discussed in the record, we must begin with some clarification as to which "Antero" is at issue.

According to a Certificate of Merger filed in Delaware on April 1, 2005, the original Antero Resources Corporation ("Antero I") merged with XTO Barnett, Inc., and the principal place of business of the surviving company, also known as Antero Resources Corporation, is in Fort Worth, Texas. That company is not the same "Antero" that is a defendant and appellant in this suit, and we do not consider its Texas contacts.[9]

The "Antero Resources Corporation" involved in this case was formerly known as "Antero Resources II Corporation" and was formed in May 2004. It is identified as a Delaware corporation in a certificate of assumed business name filed in Texas on May 13, 2004.[10] On January 17, 2006, a name-change certificate filed with the Texas Secretary of State demonstrates that the name of Antero Resources II Corporation was changed to Antero Resources Corporation. At that time, Antero had an office and a registered agent at the same Houston address. It further appears that Antero previously owned Texas assets, but sold its Texas assets and operations to a Texas corporation, EXCO Resources, Inc. ("EXCO"), in 2006.

## A. Continuous, Systematic Contacts

■ In support of its special appearance, Antero relies on the affidavit of Alvyn Schopp, Antero's vice president of administration and accounting. Schopp attested that Antero is not a resident of Texas and does not maintain any business offices here, but instead is a Delaware corporation with a principal place of business in Denver, Colorado. On the other hand, Antero's April 10, 2006 Purchase and Sale Agreement with EXCO identifies Antero as a Texas corporation. Antero does not address this contradictory evidence, and we presume the trial court resolved the conflict in Buchanan's favor. *See BMC Software,* 83 S.W.3d at 795.

Although Schopp also averred that Antero "did not conduct any business, enter into any contracts, or have any other business dealings in the State of Texas," he made this representation only "with respect to the accident made the basis of this lawsuit."[11] As a result of this qualification, Schopp's denial is directed only to specific jurisdiction, but he does not deny the general jurisdictional fact that Antero conducted business in Texas. Moreover, he conceded in his deposition that Antero was operating in Texas prior to May 16,

**8.** *See Experimental Aircraft Ass'n, Inc. v. Doctor,* 76 S.W.3d 496, 502 (Tex.App.-Houston [14th Dist.] 2002, no pet.).

**9.** These contacts include oil and gas properties and leases in Texas and letters of credit from several Texas cities and the Texas Railroad Commission.

**10.** The Certificate identified the company's assumed name as "Antero II Resources Corporation."

**11.** Schopp further testified that Antero did not own or operate the well site or equipment involved in the accident and that no Antero employees were present at the well site at the time of the accident.

2006, and continues to have a Texas franchise-tax license, a license to operate oil wells in Texas, and ownership of three Texas subsidiaries. Standing alone, ownership of a subsidiary operating in the forum state is not sufficient to establish general jurisdiction, but it is a factor to be considered. *See Villagomez v. Rockwood Specialties, Inc.*, 210 S.W.3d 720, 732 (Tex. App.-Corpus Christi 2006, pet. denied).

 Antero urges us to treat as virtually dispositive the fact that it sold its Texas assets to EXCO in 2006 and currently does not conduct business here. We agree that a business, having once established minimum contacts with a particular forum, is not forever bound to personal jurisdiction in that state, but instead may choose to sever those connections. *See World–Wide Volkswagen Corp.*, 444 U.S. at 297, 100 S.Ct. 559. We therefore accord this factor the significance to which it is entitled. *See Equitable Prod. Co. v. Canales–Treviño*, 136 S.W.3d 235, 237 (Tex.App.-San Antonio 2004, pet. denied) (noting that relocation is a significant factor in minimum-contacts analysis). But relocation from the forum state is only one of the factors to be considered in a minimum-contacts analysis, *id.*, and we are bound to consider all of the defendant's contacts "over a reasonable number of years, up to the date suit is filed." *PHC–Minden*, 235 S.W.3d at 170 (quoting Charles W. "Rocky" Rhodes, *The Predictability Principle in Personal Jurisdiction Doctrine: A Case Study of the Effects of a "Generally" Too Broad, but "Specifically" Too Narrow Approach to Minimum Contacts*, 57 BAYLOR L. REV. 135, 239 (2005) and citing *Access Telecom, Inc. v. MCI*

*Telecomms. Corp.*, 197 F.3d 694, 717 (5th Cir.1999)). As previously discussed, such "contacts" include purchases, meetings, choice-of-law clauses, and choice-of-forum clauses. Although it is not accorded the same significance as evidence of relocation, we also consider evidence that a non-resident corporation is registered to do business in Texas and maintains a registered agent for service of process. *See Conner*, 944 S.W.2d at 414 (citing *Wenche Siemer v. Learjet Acquisition Corp.*, 966 F.2d 179, 183 (5th Cir.1992)).

Under the applicable standard of review, we conclude that the evidence is insufficient to support a conclusion that Antero is subject to specific jurisdiction; there is no substantial connection between Antero's Texas contacts and activities and the operative facts of this litigation. But the same evidence—particularly the conflicting evidence that Antero is a Texas corporation and the undisputed evidence that Antero had an office in Houston and regularly conducted business in Texas from the date of its incorporation in 2004 through May 16, 2006—is sufficient to support an implied finding that for "a reasonable number of years" before Buchanan sued Antero in August 2007, Antero has had substantial systematic and continuous business contacts with Texas supporting the exercise of general jurisdiction. Other evidence cited by Buchanan reveals more attenuated contacts with Texas, and while such evidence might reinforce our conclusion that Antero deliberately affiliated itself with Texas, *see Burger King*, 471 U.S. at 482, 105 S.Ct. 2174, this evidence was entitled to and accorded less significance in our minimum-contacts analysis.[12]

---

**12.** For example, Buchanan cites evidence that Antero sends royalty payments to addresses in Texas concerning its oil and gas leases in Oklahoma and Colorado, and two employees who work for Antero in Oklahoma actually reside in Texas. As previously discussed, however, a third party's choice of residence, whether a royalty-interest owner or an employee, is not conduct by the nonresident corporation directed at the forum state. *See*

## B. Fair Play and Substantial Justice

■ Because Antero purposefully availed itself of the privileges and benefits of conducting business in Texas, it could avoid the exercise of personal jurisdiction only by presenting a compelling argument that subjecting it to litigation here would not comport with traditional notions of fair play and substantial justice. *See Guardian Royal Exch.*, 815 S.W.2d at 231. Antero argues, and we agree, that Texas has no distinct interest in litigating Buchanan's claims here. *See Asahi Metal Indus. Co., Ltd. v. Superior Court of Calif., Solano County*, 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) ("Because the plaintiff is not a California resident, California's legitimate interests in the dispute have considerably diminished."). But this factor, without more, is not "compelling."

Antero also asserts that it would be onerous and impractical to transport "the entirety of this case, including witnesses, the parties, their lawyers, and physical evidence, across state lines for pretrial proceedings and trial." Antero cites no evidence in support of this contention, and considering that Antero regularly conducted business in Texas for most of its existence before this suit was filed, the extent of the burden posed by this litigation is not readily apparent. The record instead demonstrates that Antero employees already travel to Texas for business meetings, and Antero has been represented by Texas attorneys throughout its existence, both in this litigation and for corporate legal advice. Moreover, it is not necessarily true that litigation in Texas of Buchanan's claims against Antero would require the entirety of the case to be transported across state lines. For example, Schopp, Huckins, and Glen McAlister, Frontier's

*Burger King*, 471 U.S. at 475, 105 S.Ct. 2174; *U–Anchor Adver.*, 553 S.W.2d at 763. Buchanan additionally asserts that Antero employee and Texas resident Ivan "John" Kawcak owns preferred stock in Antero, but again, this is not conduct by Antero. Kawcak also drives a vehicle owned by Antero, but he "offices" in Oklahoma and the record evidence does not identify the state in which the vehicle is registered or used. It also is undisputed that another Antero employee, Steve Woodward, traveled to Texas to meet with "gathering companies" for Antero's natural gas plants in Oklahoma, but the record does not identify whether this trip occurred before or after suit was filed. Schopp testified only that the trip occurred within the six months preceding his deposition, and the suit had been pending for more than four months at that time. *Cf. PHC–Minden*, 235 S.W.3d at 170 (explaining that minimum-contacts analysis is concerned with the defendant's presuit contacts).

Buchanan further relies on evidence that Antero and a company identified as "XTO Energy" participate together in drilling oil wells in Oklahoma; individual Antero shareholders also own stock in XTO Energy; and

Antero provided management services for "XTO Energy entities" until June 30, 2005. She cites no evidence, however, that XTO Energy is a Texas corporation or resident. To the contrary, the certificate of merger and a "registration rights agreement" on which Buchanan relied in the trial court identifies "XTO Energy, Inc." as a Delaware corporation.

Buchanan additionally points to evidence that Antero purchased goods or services in Texas and remitted payment to Halliburton Energy Services, Inc. in Houston for services rendered at the rig in Colorado where the accident occurred. She also places particular emphasis on the fact that Antero obtains legal services from attorneys at the Houston branch of Vinson & Elkins, an international law firm, and notes that Schopp traveled to Houston to confer with Antero's attorneys in June 2007. But Buchanan identifies no basis for treating a nonresident corporation's purchase of legal services differently from its purchase of other goods and services, and we decline to do so. *See Helicopteros*, 466 U.S. at 418, 104 S.Ct. 1868 (explaining that a nonresident defendant's employees' visits to Texas for training were "no more a significant contact" than trips to purchase goods).

managing director, each were deposed in Colorado. Schopp further admitted in his deposition that he had no evidence to support the assertion that physical evidence would have to be transported across state lines.

We conclude that Antero has not presented a compelling argument that Buchanan's claims against it present a rare instance in which the trial court's exercise of personal jurisdiction over a nonresident defendant who has purposefully established minimum contacts with the forum state violates traditional notions of fair play and substantial justice. *See Guardian Royal Exch.*, 815 S.W.2d at 231. We therefore affirm the trial court's denial of Antero's special appearance.

## VI. PICEANCE

 Piceance is the entity that operated the well at the site of the accident. It asserted in its verified special appearance that it is a Delaware corporation with a principal place of business in Denver, Colorado and no business offices or business dealings in Texas. According to the record evidence, Piceance has no subsidiaries, and although it has purchased goods or services from Texas vendors for use outside the state, its operations are confined to the State of Colorado. Since its

incorporation in 2006, Piceance has received legal advice from attorneys at the Houston branch of Vinson & Elkins. As previously discussed, however, it is well-established that such evidence, without more, is legally insufficient to establish that a foreign corporation maintained continuous and systematic contacts with the forum state. *See Helicopteros*, 466 U.S. at 417, 104 S.Ct. 1868; *Rosenberg Bros. & Co.*, 260 U.S. at 518, 43 S.Ct. 170; *PHC–Minden*, 235 S.W.3d at 170. Thus, Piceance has insufficient contacts to support the exercise of general jurisdiction. Due to the absence of a substantial connection between Piceance, Texas, and the operative facts of the litigation, the exercise of specific jurisdiction also is unsupported. Finally, the fairness considerations cited by Buchanan are the same as those made regarding All Star, and for the reasons previously discussed, these are inadequate to justify the exercise of personal jurisdiction based on contacts that fall so far short of the minimum.

### A. Jurisdictional Veil–Piercing

 Buchanan also attributes Antero's contacts to Piceance, arguing that the two companies constitute a single business enterprise [13] or are alter egos of one another.

---

**13.** Citing *Paramount Petroleum Corp. v. Taylor Rental Center*, 712 S.W.2d 534 (Tex.App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.), Buchanan argued, both in the trial court and on appeal, that Antero, Piceance, and other related entities should be treated as a single business enterprise based on factors such as (1) common employees, (2) common offices, (3) centralized accounting, (4) one business paying the wages of the other business's employees, (5) a common business name, (6) services rendered by employees of one business on behalf of the other business, (7) undocumented transfers of funds between businesses, and (8) an unclear allocation of profits. These are the factors described in *Paramount Petroleum* to be considered in de-

termining whether the single-business-enterprise theory of liability applies. That theory, however, has been expressly rejected by the Texas Supreme Court. *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 456 (Tex.2008).

The unavailability of the single-business-enterprise theory of liability does not mean that Buchanan's discussion of the same factors for jurisdictional purposes is entirely misplaced, but because personal jurisdiction involves due-process considerations that may not be overridden by statutes or the common law, jurisdictional veil-piercing and substantive veil-piercing involve different elements of proof. *See PHC–Minden*, 235 S.W.3d at 174. Hence, some of the factors previously consid-

To pierce the corporate veil for jurisdictional purposes, a plaintiff must prove that one company "controls the internal business operations and affairs" of the other to such an extent that "the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice." *BMC Software*, 83 S.W.3d at 799. As the party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities, Buchanan bore the burden to prove these allegations. *See id.* at 798.

In determining whether a plaintiff asserting personal jurisdiction has overcome the presumption of corporate separateness, courts may consider, *inter alia*, (1) the amount of stock in one company that is owned by its affiliate; (2) whether the entities have separate headquarters, directors, and officers; (3) whether corporate formalities are observed; (4) whether the entities maintain separate accounting systems; and (5) whether one company exercises complete control over the other's general policies or daily activities. *Freudensprung v. Offshore Technical Servs., Inc.*, 379 F.3d 327, 346 (5th Cir.2004). These factors are not of uniform significance, as is illustrated by *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925). In *Cannon*, a North Carolina plaintiff sued a Maine corporation and served process on the defendant's wholly-owned Alabama subsidiary. The Supreme Court refused to attribute the subsidiary's forum contacts to the parent corporation, and explained its reasoning as follows:

> Through ownership of the entire capital stock and otherwise, the [Maine] defendant dominates the Alabama corporation, immediately and completely, and exerts its control both commercially and financially in substantially the same way, and mainly through the same individuals, as it does over those selling branches or departments of its business not separately incorporated which are established to market the [plaintiff's] products in other states. The existence of the Alabama company as a distinct corporate entity is, however, in all respects observed. Its books are kept separate. All transactions between the two corporations are represented by appropriate entries in their respective books in the same way as if the two were wholly independent corporations.

*Id.* at 335, 45 S.Ct. 250. The Court further stated that "[t]he corporate separation, though perhaps merely formal, was real. It was not pure fiction." *Id.* at 337, 45 S.Ct. 250. Stated differently, a "blurring of the distinction"[14] between entities is insufficient to support jurisdictional veil-piercing, because if affiliated companies maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other. *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir.1983).

Here, Buchanan argues that Antero, Piceance, and other companies have "publicly represented such unity" that they should be treated as one. In support of this assertion, she cites evidence that (1) Antero and Piceance have common employees; (2) Schopp is the vice-president of accounting and administration for both companies; (3) employees have stock options in both entities; (4) Antero and Pi-

---

ered in determining whether two companies acted as a single business enterprise still may be useful in determining whether to disregard the corporate structure, *see SSP Partners*, 275 S.W.3d at 455, but others are irrelevant to jurisdictional analysis. *PHC–Minden*, 235 S.W.3d at 174–75.

14. *Stuart v. Spademan*, 772 F.2d 1185, 1198 (5th Cir.1985).

ceance have a single business office; and (5) both companies use a letterhead styled simply, "Antero Resources." These facts, however, are legally insufficient evidence that Antero or Piceance controls the other. *See, e.g., U.S. LED, Ltd. v. Nu Power Assocs., Inc.*, C.A. No. H–07–0783, 2008 WL 4838851, at * 6 (S.D.Tex. Nov. 5, 2008) (slip op.) (finding stock ownership, shared office space and employees, and provision of unpaid services and training insufficient to support jurisdictional veil-piercing under an alter-ego theory absent evidence that one company "exercised meaningful, much less 'complete,' control over [the other's] daily activities").

Although the employees common to Antero and Piceance were paid by Antero, this is not evidence of an abnormal degree of control; the evidence instead is undisputed that Antero billed the affiliated entity for services rendered by the employees, and the affiliated entity remitted payment to Antero for such services. *Cf. PHC–Minden*, 235 S.W.3d at 176 (rejecting jurisdictional argument that three officers of the subsidiary corporation were paid by the parent company and explaining that the salaries were intercompany payables funded by the subsidiary's revenue); *BMC Software*, 83 S.W.3d at 799 (explaining that evidence that parent corporation performed services for its subsidiary would not support jurisdictional veil-piercing absent evidence that the subsidiary was not charged for such services); *Conner*, 944 S.W.2d at 419–20 (rejecting attempt to pierce the corporate veil under an alter-ego theory and citing evidence that parent corporation billed subsidiary for services rendered by parent's employees). Evidence that Schopp held the same office in both companies also is inadequate, because to "fuse" the two corporations for jurisdictional purposes, Buchanan was required to produce evidence that the degree of control exercised by one company over the

other was "*greater* than that normally associated with common ownership and directorship." *BMC Software*, 83 S.W.3d at 799 (emphasis added). Thus, duplication of some or all of the directors and officers is not evidence of such control. *Id.* And as the Texas Supreme Court explained in *BMC Software*, the use of letterhead containing parts of the entities' names that are common to both companies is no evidence that the two entities fail to observe corporate formalities. *Id.* at 800; *see also PHC–Minden*, 235 S.W.3d at 175 ("Whether two related entities share a common name, however, does not affect whether each has sufficient contacts with the forum for jurisdictional purposes.").

Although Buchanan further contends that Antero pays Piceance's service vendors, we cannot draw this inference. In support of this assertion, Buchanan cites evidence that vendors addressed invoices for goods or services obtained for rigs operated by Piceance to "Antero," "Antero Resources," or "Antero Resources Corp." Invoices, however, are not evidence of payment by a particular defendant. Moreover, the invoices are addressed by the vendors, not by Antero or Piceance, and our jurisdictional inquiry is focused only on the defendants' conduct, not on the actions of third parties. *Burger King*, 471 U.S. at 475, 105 S.Ct. 2174; *U–Anchor Adver.*, 553 S.W.2d at 763. Finally, inasmuch as the names of a number of affiliated companies begin with the words "Antero Resources," it is at least as likely that the vendors were referring to "Antero Resources Piceance Corporation," the entity that actually operated the site, rather than to an affiliated company. *See BMC Software*, 83 S.W.3d at 800. Thus, under the equal-inference rule, these invoices are no evidence that vendors providing goods and services for operations at the site contracted with or through Antero or were paid by an entity

other than Piceance. *See City of Keller v. Wilson*, 168 S.W.3d 802, 813–14 (Tex.2005) (discussing the equal-inference rule); *Lee v. Hasson*, 286 S.W.3d 1, 23 (Tex.App.-Houston [14th Dist.] 2007, pet. denied) (applying the equal-inference rule). To the contrary, the evidence is uncontroverted that Piceance paid its vendors directly from its own bank account.

In sum, the evidence is uncontroverted that Antero and Piceance maintain separate books, each pays its own independent contractors, and neither company invests in the other, whereas the evidence on which Buchanan relies is insufficient to overcome the presumption that the two separate corporations are distinct entities. *See BMC Software*, 83 S.W.3d at 798. Indeed, we previously have considered evidence much stronger than this and held it insufficient to support jurisdictional veil-piercing. *See, e.g., Conner*, 944 S.W.2d at 419–20.[15] Because the evidence is insufficient to support the trial court's exercise of personal jurisdiction over Piceance based on its own contacts, and Antero's contacts may not be imputed to Piceance, we sustain Piceance's sole issue on appeal. Accordingly, we reverse the trial court's order denying Piceance's special appearance and remand for dismissal and severance of Buchanan's claims against it.

## VII. FRONTIER

According to the record evidence, Frontier is a limited liability corporation with its principal office in Colorado and registered to do business in Oklahoma, Colorado, Utah, and North Dakota. Frontier stores, builds, and services rig equipment in Roosevelt, Utah and Oklahoma City, Oklahoma and conducts drilling operations in Colorado and Utah. All of its accounting offices are in Oklahoma City. Frontier is not registered to do business in Texas, owns no property in Texas, conducts no advertising or marketing in Texas, and employs no Texas residents.

As evidence that Frontier has established minimum contacts with Texas sufficient for the exercise of general or specific jurisdiction, Buchanan relies on evidence that Frontier made purchases from and visited Texas vendors, is a party to other litigation in Texas, and recruits Texas residents through an interactive website. For the reasons discussed below, we conclude that this evidence, considered collectively, is insufficient to support the exercise of personal jurisdiction.

### A. Relationships with Texas Vendors

As evidence that Frontier has sufficient contacts with Texas to allow Texas appropriately to exercise personal jurisdiction, Buchanan first relies on Frontier's purchases from and visits to Texas vendors. Specifically, there is evidence that Frontier has purchased equipment or services from approximately a dozen Texas vendors,[16] and Frontier's managing di-

---

**15.** In *Conner*, we concluded that a parent and subsidiary were not alter egos of one another even though the parent initially capitalized the subsidiary; the companies shared headquarters and a bank account; the office sign identified only the parent corporation; the phone was answered solely on behalf of the parent corporation; employees were paid the same benefits by the same payroll system; the parent's employees provided legal, accounting, and other services to the subsidiary; and half of the subsidiary's revenue was produced by providing shipping services to the parent corporation. *Conner*, 944 S.W.2d at 419.

**16.** These vendors include (1) Challenger Equipment in Tomball, (2) Downhole Pipe & Equipment in Sugar Land, (3) Jake's Equipment in Houston, (4) Lake Steel in Amarillo, (5) Omron in Houston, (6) Panalpina in Houston, (7) Pentagon Freight Services in Houston, (8) Quality Bit & Supply Company in Houston, (9) Southwest Oil Field Productions in Houston, (10) Townsend in Odessa, and

rector, Glen McAlister, has visited five vendors in Texas.[17]

At least three Texas vendors supplied materials used in constructing or operating Rig No. 3, which Frontier built at its facility in Roosevelt, Utah:

- The rig is constructed from steel obtained from Lake Steel in Amarillo, but Frontier personnel have not visited Lake Steel's Texas facility.
- The rig incorporates a blow-out preventer ("BOP") that was purchased from Challenger Equipment ("Challenger") in Tomball, Texas after Challenger sent a quote for the BOP to Frontier's office in Oklahoma City. Challenger then shipped the equipment to Frontier.
- Frontier purchased drill string used on Rig No. 3 from Downhole Pipe & Equipment ("Downhole"). Although Downhole is located in Sugar Land, Texas, the equipment purchased by Frontier originated in China and was shipped to Frontier through Long Beach, California. Although McAlister previously has visited Downhole's Texas office, he has not done so since founding Frontier.

Frontier also may have purchased unspecified equipment for Rig No. 3 from Voorhees Equipment & Consulting, a Houston equipment dealer that McAlister has visited twice. Finally, Frontier purchases rig supplies from sales representatives who visit the rigs, but Frontier personnel generally do not know whether companies who employ such representatives are based in Texas; Frontier pays local sales tax for such purchases.

We hold that Frontier's Texas purchases and visits do not support the exercise of specific jurisdiction because no allegations or evidence substantially connect them to the accident, to Jay Buchanan's death, or to any of the elements of Buchanan's claims. We further conclude Frontier's contacts with Texas vendors, considered together with the other jurisdictional evidence discussed below, do not rise to a level that can be considered sufficiently continuous and systematic so as to support the exercise of general jurisdiction. *See Helicopteros*, 466 U.S. at 411–18, 104 S.Ct. 1868 (declining to exercise jurisdiction over a helicopter company that purchased spare parts, accessories, and eighty percent of its fleet from a Texas helicopter manufacturer, sent its pilots for training in Texas, and transported helicopters from Texas); *Moni Pulo Ltd. v. Trutec Oil & Gas, Inc.*, 130 S.W.3d 170, 175–76 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) ("[N]egotiating and signing a contract in Texas is insufficient if performance takes place elsewhere."); *3–D Elec. Co. v. Barnett*

(11) Voorhees Equipment & Consulting in Houston.

17. McAlister visited Challenger Equipment once to view a portable rig, but did not purchase it. He also visited Jake's Equipment three times; Omron an unspecified number of times; Voorhees Equipment & Consulting twice; and Panalpina once. McAlister was questioned about invoices to M/D Totco, Texas Oil Patch Services, Texas First Industrial, Trans–Pecos Trucking, Vista Sales & Service, and GB International, but these companies were not specifically identified as Texas companies or residents. In addition, Frontier purchased goods or services in Oklahoma, Utah, or Colorado from local offices of companies who may have additional offices in Texas. These companies include Lone Star Safety & Supply, Simons Petroleum, T.H. Hill & Associates, W.G. Wood Group, WWL Industries, Weatherford, and Wilson. Buchanan also contends that Frontier employed Houston-based inspectors to conduct inspections on its rigs, but this contention is not supported by the record. The evidence instead is uncontroverted that the rig operator would have selected any inspection company used.

*Constr. Co.,* 706 S.W.2d 135, 138–40 (Tex. App.-Dallas 1986, writ ref'd n.r.e.) (holding negotiations and agreement by telephone and mail between Tennessee general contractor and Texas subcontractor insufficient to establish personal jurisdiction of the former in Texas because the work was performed in Colorado).

**B. Texas Litigation**

 Buchanan next points out that Frontier is a defendant and counter-claimant in a "Texas" lawsuit. The lawsuit to which Buchanan refers is a federal lawsuit based on diversity and, apparently, specific jurisdiction. *See Jake's Equip. & Repair, Inc. v. Frontier Drilling L.L.C. and Advanced Rig & Equip., Inc.,* C.A. No. H–08–1360, 2009 WL 3123205 in the United States District Court for the Southern District of Texas, Houston Division. But we again must point out that our jurisdictional inquiry focuses upon a nonresident defendant's contacts with the forum state for "a reasonable number of years" before suit was filed. *See PHC–Minden,* 235 S.W.3d at 170. Here, the uncontroverted evidence establishes that the *Jake's Equipment* litigation was filed sometime between January 28, 2008, when McAlister attested that "Frontier has never been sued in the State of Texas," and May 22, 2008, when McAlister stated in his deposition that Frontier had been sued in Texas by Jake's Equipment. And although Frontier does assert a state-law counterclaim in that action, the pleading in which the claim is asserted was filed in mid–2008, many months after Buchanan sued Frontier. As the only evidence concerning the federal lawsuit is dated after the time that Buchanan sued Frontier, it is beyond the scope of our minimum-contacts inquiry.[18]

**C. Interactive Website**

 Finally, Buchanan contends that Frontier's interactive website provides a basis on which to establish jurisdiction. In cases involving interactive websites, jurisdiction is determined by the degree of interaction. *Experimental Aircraft Ass'n, Inc. v. Doctor,* 76 S.W.3d 496, 506–07 (Tex.App.-Houston [14th Dist.] 2002, no pet.). "Internet use is characterized as falling within three categories on a sliding scale for purposes of establishing personal jurisdiction." *Michel v. Rocket Eng'g Corp.,* 45 S.W.3d 658, 677 (Tex.App.-Fort Worth 2001, no pet.) (citing *Jones v. Beech Aircraft Corp.,* 995 S.W.2d 767, 772 (Tex.App.-San Antonio 1999, pet. dism'd w.o.j.)). "At one end of the scale are websites clearly used for transacting business over the Internet, such as entering into contracts and knowing and repeated transmission of files of information, which may be sufficient to establish minimum contacts with a state." *Reiff v. Roy,* 115 S.W.3d 700, 705 (Tex.App.-Dallas 2003, pet. denied) (citing *Michel,* 45 S.W.3d at 677); *see also Moki Mac,* 221 S.W.3d at 586 (drawing an analogy between jurisdictional inquiries based on advertising in the forum state and allegations that the nonresident defendant attempted to recruit forum residents); *Weber v. Jolly Hotels,* 977 F.Supp. 327, 333–34 (D.N.J.1997) (comparing internet advertising to advertising in a national magazine and noting that internet advertising "is not tantamount to directing activity at or to purposefully availing oneself of a particular forum"). On the other end of the spectrum are "passive" or "informational" websites that are used only for purposes such

---

**18.** Moreover, as previously discussed, a defendant's failure to challenge the exercise of specific jurisdiction in a different case does not demonstrate that it has the continuous and systematic contacts with Texas necessary for the exercise of general jurisdiction. *Nath,* 238 S.W.3d at 501.

as advertising "and are not sufficient to establish minimum contacts even though they are accessible to residents of a particular state." *Michel*, 45 S.W.3d at 677. Between these two extremes are " 'interactive' websites that allow the 'exchange' of information between a potential customer and a host computer." *Id.; Reiff*, 115 S.W.3d at 706.

■ Frontier's website is interactive, and anyone viewing the website may submit an online application for employment; however, it is stated on the site, "If interested in applying for a position with Frontier Drilling, please note that all operations are taking place in Utah and Colorado. If you need to talk to somebody, please contact our Roosevelt, UT office...." There is no evidence that Texas residents are targeted for recruitment; to the contrary, the site is accessible by "[a]nybody in the world." Although visitors can post comments about Frontier and subscribe to its "feed," there is no evidence that it makes sales or contracts through the site, and no evidence that Frontier can even respond to applications, comments, or queries through the website. We therefore conclude that the website is too "passive" to establish systematic and continuous contacts sufficient to support general jurisdiction. *See, e.g., Reiff*, 115 S.W.3d at 706 (hotel's website that allowed online reservations did not support jurisdiction); *Bell v. Imperial Palace Hotel/Casino, Inc.*, 200 F.Supp.2d 1082, 1091 (E.D.Mo.2001) (same); *Dagesse v. Plant Hotel N.V.*, 113 F.Supp.2d 211, 224 (D.N.H.2000) (no evidence defendant used website to conduct commercial transactions or other activities with residents of forum); *see also Michel*, 45 S.W.3d at 678 (website did not support jurisdiction where operator could not directly respond to internet inquiries through website); *Riviera Operating Corp. v. Dawson*, 29 S.W.3d 905, 911 (Tex.App.-Beaumont 2000, pet.

denied) (same); *Daimler–Benz Aktiengesellschaft v. Olson*, 21 S.W.3d 707, 725 (Tex.App.-Austin 2000, pet. dism'd w.o.j) (interactive website that allowed Texas residents to submit comments and questions and receive electronic mailings but did not allow sales or other contracts is a factor to consider in evaluating jurisdiction).

## D. Fair Play and Substantial Justice

■ Concerning the due-process requirement that the exercise of personal jurisdiction comport with traditional notions of fair play and substantial justice, Buchanan repeats the same arguments made with respect to All Star and Piceance. We reject those arguments for the same reasons previously stated: Texas has no interest in adjudicating Buchanan's claims against Frontier, and the interests of convenience, efficiency, and coequal sovereignty are all better served by litigation in Colorado. *See Guardian Royal Exch.*, 815 S.W.2d at 231.

There being no basis on which to affirm the trial court's exercise of personal jurisdiction over Frontier, we reverse the trial court's order denying Frontier's special appearance and remand with instructions to the trial court to sever and dismiss those claims.

## VIII. CONCLUSION

We hold that Antero has maintained continuous and systematic contacts with Texas for a reasonable number of years prior to this suit, and the exercise of general jurisdiction over it comports with traditional notions of fair play and substantial justice. We therefore overrule Antero's sole issue on appeal and affirm the trial court's order denying Antero's special appearance. But because the exercise of personal jurisdiction over All Star, Piceance, and Frontier is not supported by

the existence of minimum contacts and the interests of fair play and substantial justice, we sustain the issues each has presented, reverse the trial court's orders denying their respective special appearances, and remand the case with instructions to sever and dismiss Buchanan's claims against All Star, Piceance, and Frontier.