**Reversed and Memorandum Opinion filed June 27, 2023**



In The

# Fourteenth Court of Appeals

## NO. 14-22-00155-CV

## CUSHMAN & WAKEFIELD U.S., INC. AND DARRIN BOYD, Appellants

## V.

## SHARESTATES INVESTMENTS, LLC AND PALLASITE REO 2018-1, LLC, Appellees

**On Appeal from the 152nd District Court**
**Harris County, Texas**
**Trial Court Cause No. 2020-04844**

## MEMORANDUM OPINION

Appellee Sharestates Investments, LLC ("Sharestates") lent money to a borrower who defaulted on at least two of its loans; one pertaining to a property in Texas, another in New Jersey. Though the underlying action pertains to both loans, this appeal only relates to the loan on the New Jersey property. In tandem with conventional avenues to recover its loss on the New Jersey Property loan,[1]

---

[1] Sharestates has also pursued other actions in connection with the New Jersey loan.

Sharestates pursued the borrower and others in Texas for fraud related to both loans to recover funds Sharestates disbursed to the two escrow agents after title transferred from seller to borrower. Sharestates added claims against the out-of-state seller of the New Jersey property, the seller's out-of-state agents (natural and corporate) and the corporate out-of-state agent's parent company, all of whom filed special appearances.

After an evidentiary hearing, the trial court sustained the special appearances filed by the seller and the corporate out-of-state agent's parent company but denied the special appearances filed by the out-of-state agents, Darrin Boyd and Cushman & Wakefield U.S., Inc. (CWUS), appellants. Boyd and CWUS filed this interlocutory appeal. We reverse and remand with instructions to the trial court to dismiss appellants for lack of personal jurisdiction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case involves two back-to-back real estate transactions and accompanying financing of property located in New Jersey ("New Jersey Property") on Dec. 28, 2017. The first conveyance involved Ardagh Glass Container, Inc., a Delaware corporation based in Muncie, Indiana ("Ardagh"), when it charitably gifted (pursuant to Section 170 of the Internal Revenue Code ("Section 170")) the New Jersey Property to Mineral County Development Authority ("MCDA"), a non-profit political subdivision of Mineral County, West Virginia (the "Ardagh Transaction"). Almost immediately thereafter, MCDA sold the New Jersey Property to 83 Griffith, LLC, a company owned by Harold Polk ("Polk"). The two transactions can be summarized as follows:



Ardaugh Glass Container
Del. Corp. headquartered in Indiana

Gifted NJ Property to

Mineral County Dev. Auth.
W. Vir. non-profit, a
subdivision of Minteral Co., W. Vir.

Sold NJ Property to

83 Griffith, LLC
NJ LLC in principal place
of business in NJ

Appellee Sharestates agreed to fund a loan of $3,830,000.00 to 83 Griffith to enable it to purchase the New Jersey Property for an alleged purchase price of $5,900,000.00 from MCDA ("New Jersey Property Sale", or "the Flip Sale"). The Flip Sale was the second of two back-to-back conveyances of the same parcel on the same day.

Appellants Boyd and CWUS participated in both the Ardagh Transaction and the Flip Sale. After it became clear that MCDA would be the recipient in the Ardagh Transaction, CWUS entered into a Consulting Agreement with MCDA, to consult with MCDA for the purpose of selling the property after the Ardagh Transaction, and at MCDA's request, ensured that any sale occurred on the same day following the Ardagh Transaction. To this end Boyd and CWUS publicized the sale for a potential buyer on Loopnet, a national web-advertising service used to list commercial properties. The property was listed for a purchase price of 2.95 million dollars, the amount from which pursuant to the Consulting Agreement, CWUS would be entitled to 65%.

In response to the Loopnet listing, Texan Harold Polk ("Polk") reached out to Boyd and CWUS expressing interest in purchasing the New Jersey Property. Polk, through his various corporate counterparts, entered an agreement and ultimately consummated the sale with MCDA to purchase the New Jersey Property for $5.9 million, twice the listed price. Polk secured financing from appellee Sharestates and a second lender, BDFI, allegedly unbeknownst to Sharestates.

3

Sharestates agreed to loan Polk roughly 65% of the acquisition price, which at closing resulted in its wire transmission of $3,740,070.00 to the Sharestates-selected title company in New York, Atlantis National Services, Inc., acting as the settlement agent. Likewise, at closing BDFI wired $2,317,500.00 to the settlement agent.

Through contract amendments, Polk and MCDA agreed that purchase funds in excess of the list price of $2.95 million would be devoted to improvements to be set up in escrow accounts. Amendments also established that Polk's New Jersey company, 83 Griffith Street, LLC would be designated as the buyer.

The record shows, and no party disputes, that Boyd and CWUS played a central role in ensuring that the Ardagh Transaction and the Flip Sale occurred. This included among other tasks, drafting and circulating the contracts and contract amendments for signature. Boyd served as the self-designated point person for many communications between the respective buyers and sellers, their agents, and the title company.

It is also undisputed in the record that neither Boyd nor CWUS ever communicated with appellees or any of their agents, were involved in appellees' lending agreement with Polk, nor were ever provided a copy of the Sharestate/83 Griffith lending agreement.

After four payments 83 Griffith stopped making payments under the loan and Sharestates foreclosed on the property, but was unable to retrieve the money devoted to the improvement escrow accounts.[2]

CWUS is organized under the laws of Missouri and allegedly has its principal place of business in Chicago. Appellant Boyd lives in Indiana and

---

[2] Sharestates obtained title to this property by a foreclosure action in New Jersey and secured an agreed judgment in a federal lawsuit for monies due under the mortgage loan.

4

allegedly is an independent contractor to CWUS. Boyd was a consultant to Ardough in the first transaction and was a consultant to MCDA in the second transaction.

Sharestates asserts that CWUS and Boyd committed common-law and statutory fraud (and fraudulent inducement), alleging the two were engaged in a joint venture with MCDA and that they were involved in a civil conspiracy with BDFI, Ehlert Law PC, and MCDA.

The core of Sharestates's claims depend on allegations that various information was misrepresented or concealed from it concerning the closing of the New Jersey property, including:

> "**[New Jersey Property] Loan AP%**" and "**Real [New Jersey Property] Purchase Price**" - Sharestates alleges that its underwriting requirements restricted its loan on the New Jersey property to 65% of the acquisition price. Sharestates's loan was based on the representation that the purchase price for the property was $5,900,000.00. Accordingly, Sharestates authorized a loan of $3,830,000.00 (it ultimately wired $3,740,070.00). But the funds actually paid to the seller, MDCA, to acquire the New Jersey property were $2,604,710.00; thus, Sharestates contends that it unknowingly funded 100% of the purchase.

> "**True source of [Non-Sharestates] Cash at Closing**"- Sharestates's alleges that "Defendants" (including CWUS or Boyd) represented that Polk would personally provide the cash at closing; however, the difference between the alleged sale price of $5,900,000.00 and Sharestates' agreed contribution was provided by an additional loan from BDFI.

> "**MDCA flip profit**"- Sharestates alleges that the seller, MDCA, received $1,492,799.75 in profits per Griffith HUD-1 Lines 603 and 506. Sharestates alleges that the fact that MDCA made a profit for flipping the property was undisclosed.

> "**BDFI** *fake* **Improvement Escrow**" and "**Ehlert** *fake* **Improvement Escrow**" - Sharestates alleges that "BDFI was the trustee of a Construction Trust created expressly for the purpose of remediation of

5

environmental contamination to the Griffith Property, but was in reality created to funnel the Lender's funds to an undisclosed third-party." Sharestates alleges that "the trustee and/or escrow agent of a second Construction Trust/escrow agreement ostensibly created for the sole purpose of remediation of environmental contamination to the Griffith Property, was in reality created to funnel Sharestates'sfunds to Polk without Sharestates knowledge."

Sharestates claims that it would not have approved the loan to Polk/83 Griffith Street had such information been provided.

Boyd and CWUS challenged personal jurisdiction. Appellees responded (asserting general and specific jurisdiction) and the parties provided the trial court with numerous exhibits to support their respective positions. In support of specific jurisdiction Sharestates alleges the following:

- CWUS/Boyd drafted and coordinated the execution of the sales contract and amendments, including

  -multiple iterations and drafts, with Polk in Texas, and his companies Grove Enterprises, LLC and subsequently 83 Griffith, LLC in Port Arthur again through Polk; and

  -the two "bogus" escrows to and with BDFI and Ehlert in Texas;

- CWUS/Boyd (including a series of unexecuted iterations and drafts) negotiated or ensured the execution of two fraudulent escrow agreements via sales contract amendments with at least six Texans to benefit five Texans totaling $2,950,000;

- CWUS/Boyd drafted, negotiated or ensured a material false sales price inflated by $2,950,000 in the sales contract with the straw "buyer" Texan Polk;

- CWUS/Boyd participated in dozens of communications to and with Texans while they were located in Texas to further the fraudulent transaction;

- CWUS/Boyd located Texan straw buyer Texan Polk and his related entities;

- CWUS/Boyd ensured the Texas straw purchaser executed and

6

exchanged the bogus contract and fraudulent amendments;

- CWUS/Boyd advertised in Texas for straw buyer;

- CWUS/Boyd orchestrated and ingratiated Boyd/CWUS as the central hub of all communications, drafts and execution of the contracts, contract amendments, and related fake escrow agreements between people and entities located in Texas (Polk, Grove Enterprises, LLC, Paul Simon, Esq., BDFI, and Jetall Companies). Boyd and Katie Blastick were both employed by CWUS and enabled the mortgage fraud scheme involving at least (10) Texans and/or entities. CWUS/Boyd transmitted these documents into Texas to Ehlert, Paul Simon, BDFI, Jetall Companies, Polk, Grove Enterprises and 83 Griffith, LLC;

- CWUS/Boyd caused the setup of the fraudulent escrows to occur in Texas by Texas Capital & Title and Texan Kellie Owens, and execution of Texan BDFI's hidden second mortgage which was executed in Texas, notarized by a Texas Notary. As a result,

  -CWUS/Boyd diverted $2,520,000 of Sharestates's funds into Texas for the benefit of BDFI;

  -CWUS/Boyd diverted $430,000 of Sharestates's funds into Texas for the benefit of Polk/Ehlert;

  -CWUS/Boyd diverted $76,600 of Sharestates's funds into Texas for the benefit of H-Capital Real Estate;

- CWUS/Boyd used BDFI's Texas funds of $2,317,500 to trick Sharestates into funding a $3,830,000 loan by falsely identifying these funds, which were located in Texas, as belonging to Polk; and

- CWUS/Boyd manipulated and directed the 83 Griffith HUD-1 Settlement Statement to contain material false information enabling the fake escrow funds to move into Texas.

In support of general jurisdiction, Sharestates alleges that fictions between parent and subsidiaries should be ignored based on CWI's Chief Operations Officer's testimony that he regularly made decisions for "multiple entities", and further alleges:

- CWUS's affiliations with Texas are so 'continuous and

7

systematic' as to render them essentially CWUS are "at home in Texas;"

- CWI handled funds owed not only to CWUS, but most if not all CWI-related legal entities from virtually all transactions across the country, including, upon information and belief, all Texas closings. These acts included receiving funds from Texas and disbursing funds into Texas;

- CWUS's Chief Operations Officer lives in Texas, has his office in Texas, and performs his duties for CWI primarily in his Texas office;

- CWI website states that Lou Cushman joined "Cushman and Wakefield, Inc. (C&W) in 1976 . . . [and] relocated from New York . . . to open and head up C&W's new office in Houston;" and

- CWI's acquisitions of brokerage firms in Texas after the lawsuit filed "to take a virtual stranglehold on Commercial Real Estate Brokerage in Texas."

Cushman & Wakefield, Inc. ("CWI") and CWUS filed a Joint Verified Amended Special Appearance which included the affidavit of Kathy Williams, operations director for the Western Region of CWUS, clarifying the relationships between the various Cushman & Wakefield entities. Williams explained that CWI—a company that provides real estate services to its clients in the New York tri-state area, including valuation and brokerage services—was organized under the laws of the State of New York, maintained its principal place of business in New York and was the parent company of Cushman & Wakefield Global, Inc., a Delaware corporation with its principal place of business in Chicago, Illinois. She explained Cushman & Wakefield Global, Inc. is the parent of CWUS. She further explained that Cushman & Wakefield of Texas, Inc. ("CW Texas") is an entity separate and apart from CWI and CWUS; CW Texas is a wholly-owned subsidiary of CWI and an affiliate of CWUS. Williams provided that there was a clear legal and formal differentiation among the various Cushman entities and, specifically,

8

between CWI and CWUS, and that it was not uncommon for an executive at CW Texas, to provide professional services for others in the group of companies, such as CWI or CWUS. She explained that performing services and serving as an officer for multiple Cushman family companies, including CWUS, while working as an employee for CW Texas, did not render Richard Cenkus an employee of any of the companies for whom he performed such services.

Following the evidentiary hearing, the trial court denied Boyd's and CWUS's special appearances. Findings of fact and conclusions of law were requested but not issued. Boyd and CWUS timely filed this appeal.

## II. ISSUES AND ANALYSIS

### A. Issues Presented

On appeal, Boyd and CWUS raise two questions: whether the trial court erred in denying CWUS's special appearance and whether the trial court erred in denying Boyd's special appearance. We consider subordinate questions necessary for our disposition.

### B. Standard of Review

We review de novo a trial court's denial of a special appearance. *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 885 (Tex. 2017). When, as in today's case, the trial court does not issue findings of fact and conclusions of law, we imply all relevant facts necessary to support the trial court's ruling that are supported by evidence. *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 8 (Tex. 2021); *Cont'l Alloys & Services (Delaware) LLC v. YangZhou Chengde Steel Pipe Co., Ltd.*, 597 S.W.3d 884, 891 (Tex. App.—Houston [14th Dist.] 2020, pet. denied).

**C. Law Governing Personal Jurisdiction**

The Texas long-arm statute authorizes Texas courts to exercise jurisdiction over a nonresident defendant who "does business" in the state. Tex. Civ. Prac. & Rem. Code § 17.042. The Supreme Court of Texas has interpreted the broad language of the Texas long-arm statute to extend Texas court's personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *M & F Worldwide*, 512 S.W.3d at 885. A plaintiff bears the initial burden of pleading allegations sufficient to bring a nonresident defendant within the scope of the long-arm statute. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794–95 (Tex. 2002). A defendant challenging a Texas court's personal jurisdiction must negate all jurisdictional bases alleged. *Id.*

A trial court may constitutionally exercise personal jurisdiction over a party when (1) the nonresident defendant has minimum contacts with the forum state and (2) the assertion of jurisdiction complies with traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Peters v. Top Gun Exec. Grp.*, 396 S.W.3d 57, 62 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

**1. Minimum Contacts**

Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *M & F Worldwide*, 512 S.W.3d at 886. "The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297

10

(1980)). A nonresident defendant's contacts with a forum state can give rise to either general or specific jurisdiction. *Id.*

### a. General Jurisdiction

A company is subject to general jurisdiction in the state of its principal place of business. *Ascentium Capital LLC v. Hi-Tech the Sch. of Cosmetology Corp.*, 558 S.W.3d 824, 829 (Tex. App.—Houston [14th Dist.] 2018, no pet.). General jurisdiction also arises when a defendant's contacts with the forum state "are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *M & F Worldwide*, 512 S.W.3d at 885 (quoting *Goodyear Dunlop Tires Operations, SA v. Brown*, 564 U.S. 915, 919 (2011)); *see also Daimler AG v. Bauman*, 571 U.S. 117, 138 (2014). General jurisdiction concerns a court's ability to exercise jurisdiction over a nonresident defendant as to any claim, including claims unrelated to the defendant's contacts with the forum. *Id.* The test for general jurisdiction requires substantial activities within the forum and is a "high bar,"[3] presenting a more demanding minimum contacts analysis than for specific jurisdiction. *TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016). Even when a defendant's contacts may be continuous and systematic, they are insufficient to confer general jurisdiction if they fail to rise to the level of rendering a defendant "essentially at home in the forum [s]tate." *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 565 (Tex. 2018).

### b. Specific Jurisdiction

Specific jurisdiction through minimum contacts with the forum state is established when the defendant (1) purposefully avails itself of the privilege of conducting activities in the forum state, and (2) the lawsuit arises or relates to the defendant's contacts with the forum. *Luciano*, 625 S.W.3d at 8–9. "Although not

---

[3] *Searcy v. Parex Resources, Inc.*, 496 S.W.3d 58, 72 (Tex. 2016).

determinative, foreseeability is an important consideration in deciding whether the nonresident defendant has purposefully established "minimum contacts" with the forum state." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002).

Three principles govern the purposeful-availment analysis: (1) only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person; (2) the defendant's acts must be purposeful and not random, isolated, or attenuated; and (3) the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction such that it impliedly consents to suit there. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009). The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court. *Id.*

### 2. Fair Play & Substantial Justice

"Once minimum contacts have been established, we must still consider whether, for other reasons, exercising jurisdiction over the nonresident defendant would nevertheless run afoul of 'traditional notions of fair play and substantial justice.' *Luciano*, 625 S.W.3d at 18 (quoting *Int'l Shoe*, 326 U.S. at 316; *TV Azteca*, 490 S.W.3d at 55). "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Id.* (quoting *Spir Star AG v. Kimich*, 310 S.W.3d 868, 878 (Tex. 2010); *TV Azteca*, 490 S.W.3d at 55.

We consider the nonresident defendant's contacts in light of (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate

judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of several states in furthering fundamental substantive social policies.

## D. Analysis

Because the trial court did not issue findings and conclusions, we imply all findings in favor of its positive jurisdictional findings.

Because Sharestates failed to allege any facts in support of establishing that Boyd is subject to general jurisdiction in Texas, we briefly address general jurisdiction as to Boyd. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011); *accord Chow v. San Pedro*, No. 14-18-00429-CV, 2019 WL 4021908, at \*4 (Tex. App.—Houston [14th Dist.] Aug. 27, 2019, pet. denied) (mem. op.). The evidence was that Boyd is a lifelong citizen and resident of Indiana. Because there is no evidence that Boyd holds a license in Texas or ever even traveled to Texas for any purpose in connection with the MCDA Transaction, and instead the only evidence is that he is a lifelong citizen and resident of Indiana who works in Indiana under an Indiana license, Boyd's domicile is *not* Texas and he is not subject to general jurisdiction in Texas. *Fisher v. First Chapel Dev. LLC*, No. 14-19-00111-CV, 2021 WL 2154108, at \*4 (Tex. App.—Houston [14th Dist.] May 27, 2021, no pet.) (explaining under Texas law, a "domicile" is (1) an actual residence that is (2) intended to be a permanent home). We conclude that to the extent that the trial court concluded Boyd was subject to personal jurisdiction based on a theory of general jurisdiction, the trial court erred.

**1. Did the trial court err by its implicit holding that CWUS's contacts with Texas were sufficient minimum contacts under a theory of general**

**jurisdiction?**

In response to Sharestates' allegations in support of general jurisdiction, CWUS submitted evidence including affidavits and deposition testimony establishing that

- CWUS was a Missouri corporation with its principal place of business in Chicago, Illinois at all relevant times;

- 611 of CWUS's 11,683 employees are based in Texas; conversely, 95% percent of CWUS's employees—11,072 people—are based outside of Texas;

- CWUS's does not own a Texas bank account;

- There is no evidence that CWUS owns any real property in Texas;

- Richard Cenkus, the employee of CW Texas and Chief Operating Officer of CW, Inc. testified that he lives and has a home office in Dallas and that he regularly made high level decisions for all Cushman entities, also testified that he worked from Texas only a couple of days per week and thus performed most of his work outside of Texas;

- Cenkus testified that he traveled "every week, multiple times a week, to multiple offices;" and

- At the time the lawsuit was filed, two of CWUS's officers—Cenkus and Armour Hollman, II—lived in Texas.

A company's principal place of business, often referred to as a company's "nerve center," is the place where the company's officers "direct, control, and coordinate" the company's activities. *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93, 130 S.Ct. 1181, 175 L.Ed.2d 1029 (2010); *Ascentium Capital LLC v. Hi-Tech the Sch. of Cosmetology Corp.*, 558 S.W.3d 824, 829 (Tex. App.—Houston [14th Dist.] 2018, no pet.). The company's nerve center normally is its headquarters, unless that is not the actual center of direction, control and coordination. *Hertz*, 559 U.S. at 93, 130 S.Ct. 1181.

Sharestates presented some testimony suggesting that some important CWUS's decisions were made by Cushman & Wakefield, Inc.'s chief operating officer in Texas and that Cushman & Wakefield, Inc. or its Texas affiliate (not CWUS) maintained a home office in Texas. However, Sharestates did not present any substantial evidence to contradict the assertion that CWUS's principal place of business remains in Illinois, i.e., not Texas. We thus consider whether Sharestates's proof elevates it to an exceptional case, such that CWUS had "continuous and systematic contacts" of an extent and nature that render CWUS "essentially at home" in Texas.

Two cases that Sharestates relies upon to support its contention that this is such an exceptional case and general jurisdiction is proper over CWUS, *Perkins v. Benguet Consol. Mining Co.*[4] and *Devon Energy Corp. v. Moreno*,[5] help illustrate the problem with its contention. In *Perkins*, the court determined the facts of the corporate defendant's residence were "exceptional" because of the company's displacement was caused by World War II, the foreign corporation's principal place of business was Ohio, not the Philippines, and because the evidence showed that the president of the corporation was exclusively located in Ohio, and he discharged all executive duties in running the company during the war in the Ohio office. *Perkins*, 342 U.S. at 447. But CWUS connection to Texas is, by comparison, unlike the relocated mining company's connection to Ohio. The only evidence concerning CWUS's principal place of business was that it was in Illinois not in Texas, and there was no evidence adduced that CWUS was ever headquartered or exclusively located in Texas. No evidence shows that CWUS was run from Texas or that CWUS solicits business from such office. Moreover,

---

[4] *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 447, 72 S. Ct. 413, 419 (1952).

[5] *Devon Energy Corp. v. Moreno,* No. 01-21-00084-CV, 2022 WL 547641, at *8 (Tex. App.— Houston [1st Dist.] Feb. 24, 2022)

even if the trial court were to, as Sharestates's argument suggests, credit Cenkus's self-proclaimed decision-making power to be so singular and essential to CWUS as the president of the mining company in *Perkins*, Cenkus's regular travel schedule and limited in-state presence does not lend to the conclusion that these corporate decisions are being made *in* Texas; Texas cannot reasonably be found to be a harbor to CWUS's "nerve center".

Sharestates also refers to our sister court's recent *Moreno* decision to contend that a "permanent general office" from which the company "solicits business in Texas" supports a finding of general jurisdiction. *Devon Energy Corp. v. Moreno,* 2022 WL 547641, at *8. Although some testimony established that Cushman & Wakefield, Inc., the related entity which the trial court dismissed for lack of personal jurisdiction, maintained an office in Dallas where Cenkus would work one or two days of the week, the record does not contain evidence that *CWUS* had a "permanent general office" in Texas.

Even if the "home office" in Dallas described in the record was attributed to CWUS, the record contains too little evidence about the type and nature of the office and CWUS's other offices by comparison to justify a general-jurisdiction finding on the basis of a "permanent general office". *See id*. (finding no general jurisdiction despite significant business presence and activity in Texas and office in Texas where there was "no evidence of the type and nature of the offices maintained"). The Court must appraise CWUS's "activities in their entirety." *See BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 414, 137 S. Ct. 1549, 1559, 198 L. Ed. 2d 36 (2017).

Under the applicable standard of review, we conclude that the evidence is legally insufficient to support an implied finding that (1) Texas is CWUS's principal place of business, or (2) CWUS's contacts are so continuous and

systematic as to render CWUS "essentially at home" in Texas. *See BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 414, 137 S. Ct. 1549, 1559, 198 L. Ed. 2d 36 (2017); *Yahsi v. Visor Muhendislik Insaat Turizm Gida Ve Mekanik Taahhut Ticaret Ltd. Sirketi*, 651 S.W.3d 79, 95 (Tex. App.—Houston [14th Dist.] 2021, no pet.).

**2. Did the trial court err by its implicit holding that Boyd's and CWUS's contacts with Texas were sufficient minimum contacts under a theory of specific jurisdiction?**

In response to Sharestates' allegations in support of specific jurisdiction, CWUS and Boyd submitted evidence including affidavits and deposition testimony establishing that

- CWUS entered a Consulting Agreement with MCDA to consult with MCDA for the purpose of selling the New Jersey Property;

- Boyd's interaction with Polk was prompted when Polk made an inquiry through Loopnet about the property;

- Boyd did not market, advertise or sell services to Polk, Grove Enterprises, LLC or 83 Griffith, LLC in Texas;

- Neither Boyd nor CWUS sought to sell the property or to be compensated for the sale based on any sale price beyond the price publicly listed, $2,950,000;

- Boyd was not a party to Polk/83 Griffth's agreements or funding arrangements with BDFI or Sharestates;

- Boyd did not establish any escrow. Rather he offered uncontroverted testimony that in drafting documents at Polk's direction, Boyd and CWUS merely drafted amendments to the purchase agreement that identified BDFI and Elhert as holders of the escrow accounts;

- Boyd did not perform any service for Polk, 83 Griffith, LLC, Ehlert Law, PC, BDFI, LLC or Jetall Companies;

- Boyd was not a party and never saw the Ehlert escrow agreement; and

- Boyd offered uncontroverted testimony refuting any contact with

17

H-Capital Real Estate.

The uncontradicted proof provided by Boyd and CWUS negated a substantial portion of allegations Sharestates relied on in support of its specific jurisdiction theory. Significantly, Boyd's testimony clarifies and disproves allegations about his role with respect to the escrow accounts. Sharestates provided no evidence supporting the contention that CWUS or Boyd had any role in the mortgage application process or collected any fee related to the mortgage loan.

Additionally, many of the contacts alleged by Sharestates (and in some instances supported by evidence) are legally insignificant. The unilateral conduct by parties, like Polk, BDFI, and Ehlert, whom Sharestates contends that Boyd and CWUS conspired with to defraud Sharestates, are not material to this jurisdictional analysis. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, Pub. Ltd. Co.,* 815 S.W.2d 223, 227 (Tex. 1991) ("the contact must have resulted from the nonresident defendant's purposeful conduct and not the unilateral activity of the plaintiff or others"). Specifically, CWUS and Boyd had no involvement in any post-closing transactions or events regarding the other parties' escrows by which Sharestates asserts the mortgage fraud was accomplished. Relatedly, the fact that Boyd and CWUS are alleged to have conspired with such parties is also irrelevant to determine jurisdiction. *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995) (the mere existence or allegation of a conspiracy directed at Texas is not sufficient to confer jurisdiction).

Specific jurisdiction could possibly be supported by the following undisputed conduct:

- CWUS/Boyd advertised the New Jersey Property on Loopnet, a national advertising website, and Polk made an inquiry through Loopnet about the property;

18

- CWUS/Boyd, as MCDA's real estate consultants, played a central role processing the paperwork of the transaction and communicating with parties to accomplish that end. Boyd facilitated the purchase and sale of the New Jersey Property between MCDA and 83 Griffith, LLC and Boyd communicated with Polk and other Texans in the course of representing MCDA in connection with 83 Griffith, LLC's purchase of the New Jersey Property from MCDA. Boyd and CWUS directed the contract and amendments to Polk, whom we presume, without deciding, was located in Texas.

We consider the quality and nature of these acts to determine if they are sufficiently purposeful.

The Loopnet posting was not targeted specifically towards potentially interested Texans; it targeted potentially interested people everywhere. Though they ran their advertising campaign through a third party, we presume for the sake of argument that Boyd and CWUS ran the website listing page as their own, and as occurred here, that the website permitted Polk, a Texas resident, a means of reaching out and contacting Boyd and CWUS directly. Even under this presumption, this functionality is not so "interactive" to deem the use of the website sufficient to establish purposeful contacts. *All Star Enter., Inc. v. Buchanan*, 298 S.W.3d 404, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.)(finding interactive website soliciting online applications for jobs in Utah and Colorado submitted online to anyone viewing for employment too passive to support jurisdiction). Sharestates presented no evidence that Texas residents are targeted on the website; to the contrary, the site is accessible by "[a]nybody in the world." *All Star Enter., Inc. v. Buchanan*, 298 S.W.3d 404, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.); see also *Wilkerson v. RSL Funding, L.L.C.*, 388 S.W.3d 668, 681 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (holding that the unilateral activities of internet users who might use the search functions of

Yahoo! and Yelp to find business information in a particular geographic location cannot be the basis for exercising jurisdiction). The listing and use of Loopnet's website to promote the New Jersey property to a nationwide audience does not demonstrate purposeful contacts with Texas.

We next consider Boyd's role in facilitating the sale of the property. Neither Boyd nor any CWUS representative ever visited Texas in connection with the New Jersey Property sale. Boyd met with Polk once in New Jersey regarding the transaction. The only clear evidence of Boyd's communication with Texas are emails to Polk, a contract amendment drafted by Boyd or others at CWUS containing a "Buyer's" signature block for a Polk's Texas-based company, and Boyd's own testimony about telephone calls he had with Polk. Even presuming that Boyd was aware that each of his emails with Polk were received by Polk *in Texas*, and that each time Boyd was on the phone with Polk, that Polk was on the other end of the line *in Texas*,[6] these contacts with Texas were fortuitous and not purposeful. *Alenia Spazio, S.p.A. v. Reid*, 130 S.W.3d 201, 213 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding that "numerous telephone and facsimile communications with people in Texas relating to an alleged contract do not establish minimum contacts"); *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 560 (Tex. 2018)("On their own, numerous telephone communications with people in Texas do not establish minimum contacts, and we have noted that changes in technology may render reliance on phone calls obsolete as proof of purposeful availment.").

---

[6] Although Boyd had discussions with Polk and other Texas residents and although there was sufficient information for the trial court conclude that Boyd knew or should have known he was communicating with Texas residents and with entities located in Texas, the record did not clearly illustrate that Boyd knew or should have known that his communications with Texans were received in Texas.

We have previously found Texas-directed purposeful availment lacking based on evidence of multiple communications made in furtherance of an out-of-state real estate transaction that ultimately does not involve any Texas party. *See Bryan v. Gordon*, 384 S.W.3d 908 (Tex. App.—Houston [14th Dist.] 2012, no pet.)(holding nonresident real estate agents did not target Texas and the relationship between the parties and their communications concerned a one-time Oregon real estate transaction that had no connection to Texas other than the fact that mortgagor happened to reside in Texas and was located there when she received and signed the contract); *see also Peredo v. M. Holland Co.*, 310 S.W.3d 468, 474–75 (Tex. App.—Houston [14th Dist.] 2010, no pet.)(holding –despite a record of numerous communications with Texans by the defendant–that contacts with Texas were not purposeful where none of the contracting parties were from Texas in case where nonresident was sued on allegations of misrepresentations about past and future payments to be made by a Mexican company that he previously owned to secure contracts and continue business). Today's case is not materially different from these cases, which both illustrate that an out-of-state defendant's incidental contacts and communications with Texans made in the course of carrying out or facilitating an out-of-state contract does not equate to minimum contacts. Neither Boyd nor any CWUS's contacts or communications with Texans in this case amounted to any more than an incidental component of the work and transaction centered elsewhere, in New Jersey.

Under the applicable standard of review, we conclude that the evidence is legally insufficient to support an implied finding that any of the relevant contacts between Boyd or CWUS with Texas or Texas entities was adequately purposeful.[7]

---

[7] Because we conclude that purposeful availment requirement was not established, we need not consider the "relatedness" component of the specific jurisdiction analysis or the fair play and substantial justice component of the minimum contacts analysis.

To the extent the trial court concluded it could properly exercise personal jurisdiction over Boyd or CWUS based on specific jurisdiction, the trial court erred.

## III. CONCLUSION

Because the trial court erred in denying Boyd and CWUS's special appearance, we sustain their respective issues, reverse the trial court's order, and remand with instructions to the trial court to dismiss the claims against Boyd and CWUS for lack of personal jurisdiction.


/s/    Randy Wilson
Justice

Panel consists of Chief Justice Christopher, Justice Bourliot and Justice Wilson.

22